Good morning. May it please the court, DNA Evangelists, on behalf of SQM&A, I'd like to reserve five minutes for rebuttal. Pomona went to trial for the third time on its design defect claim, alleging that SQM&A's fertilizer was designed to have too much perchlorate. The first two times, Pomona lost. This time, it won, but only after deciding not to offer a design expert to explain what level of perchlorate the fertilizer actually had or what level it was effective in. You cited a case that's on record to indicate that they have to produce an expert for a design defect. When I looked at the case that you cited in your own briefing, Stephen v. Ford Motor Company, it seems to indicate that there's expert testimony that's required for causation. That's what they say. It doesn't say for design as well. So can you point to me something that indicates that expert testimony is required to be shown? Yes, Your Honor. I'll also point, I think Stephen does it, I think Howard also does, so I'll point to Howard at page 426 where it says, it's a plain why. We have to ask, why is expert testimony so important? It's because, in the words of the Court of Appeal, the issue of design defect cannot fairly be resolved by standardless reference to the expectations of an ordinary consumer. And it goes on to say, expert testimony is required to assist the finder of fact. What do you read from there? Which case? That is Howard. So Howard was quoting Sewell. So I believe that if we look at this body of California law, why is it that that's required in this context? That's because ordinarily consumers can't tell in some context whether a product is defective. They need expert testimony where it's complex. And this court held in 2017 that the risk utility, risk benefit test under California law, which again is the test that applies when an ordinary lay consumer cannot determine whether a product is defective, that that test applies here because this, again, this is a highly technical product liability case. So we see two strains of cases in California. And so when we're in this world of risk benefit analysis, you need an expert. And so courts have said time and again in this court, repeatedly, just last week in the Braverman case, it articulated this principle. We submitted a trial in jail. The Braverman case involved the consumer expectation test, which is a different test that's being applied in this case. So why should we consider that in a mem dispo, by the way? Well, Braverman, it cites Stephen in all of these cases in California and the same as Shalaby from this court. I think the proposition is really uncontroverted under California law that you need an expert in this context. And what Braverman was saying is it was saying that in that case, it was saying that you couldn't apply a consumer expectations test actually because it was too complex. You needed an expert to establish the defect. And they didn't have that there. So that was the issue in Braverman. And, again, it's just, once again, repeating this longstanding principle. And if we go back to — But Braverman wasn't dealing with the risk benefit test. Is that fair to say? Your Honor, I think it was describing what the requirements are. It said we see no context, no circumstances under which a plaintiff could forego an expert. I think that was the way the court sort of phrased it in the negative. We're not aware of any case or circumstances where the plaintiffs could forego expert testimony. They point to the consumer expectations test. Even assuming it could apply here, it wouldn't apply here. So let me go back to my question, which is you're indicating that the case that you believe that stands for the proposition, that you need a design expert, is Howard is what you're saying. It's several. It's Howard. It's also Stephen. And, Your Honor, to go back to your point about causation, I think it's really all bound up together. Because what is causation? Causation is the principle that plaintiff has to establish that there is some feature of the product, that is the defect, that caused, it was the proximate cause of the injury. So that's what we're talking about here. That was missing here. So let's go back to what happened here at trial. This plaintiff's actually had, Pomona had two design experts. It didn't call either one. It had Mr. Stoll. It had Mr. Walton. They had testified in prior trials. The jury wasn't persuaded. They lost both times. Both of those experts would have testified to what the design was, that it was 0.1% per chlorate, and then that was stolen. And then Walton would have said that the fertilizer could have been redesigned or should have been redesigned so that it would have 0.01 to 0.05% per chloride. So that's the testimony. Although in this case, as my understanding was, they did have two witnesses or two depositions. It's my understanding. Executive Vice President Patricio Disselmanhack, I can't pronounce that. Thank you. who did testify that the typical or average percentage per chloride in sodium nitrate in the 1930s and 50s was 0.2, 0.3, 0.4, and a maximum of 0.5. And then another of their executives testified that they could produce that Chilean nitrate fertilizer with less than 0.1. So there was that testimony that the jury considered. So, Your Honor, a few points. First, that's categorically just not sufficient because it's not expert testimony. It's lay testimony. It's lay witnesses. And it wasn't testimony about a design defect. What plaintiffs did at trial, and this is where Disselmanhack's testimony comes in, it was really a bait and switch. They started out by saying that they were trying to risk a design defect case, but they switched their theory at trial to a manufacturing defect case. What they did was not say that this design was what caused this problem, that it was defective. They said that it was supposed to be 0.1 percent, but actually many times it was 0.2, 0.3, 0.4 percent. So I'm going to finish the thought, and then I want to have a close. Yes, and if we look at, I just want to point to the opening and closing and how they used that testimony. The opening, Pomona's opening and closing, and the court could see that, where they're saying that the product was supposed to be this way, but actually it came out that way. That's a manufacturing defect theory. They did not try and manufacture, they didn't have a claim for a manufacturing defect. So that was the bait and switch that I referenced earlier. They came to court. They didn't call their two design experts. They cobbled together this lay witness testimony that never said the product was defective. The only design evidence in the record is really the patent, and it was undisputed. And the patent is for 0.1 percent. So that is the design. And then they didn't have an expert to say that it should have been 0.01 percent or 0.05 percent. They never had that testimony from an expert to explain to the jury. The jury could not in their lay experience know about the chemical composition of this fertilizer, and that's why this court said that the consumer expectations test wouldn't apply when it remanded in 2017. So can I just get back to the issue of the bait and switch? If the case was tried on a manufacturing defect theory, but the complaint alleged a design defect, what was your client's argument at trial with respect to the manufacturing versus design defect? Well, Your Honor. Who was arguing manufacturing defect? It came out of left field, Your Honor. This is not a claim that's ever been in the case. It just sounded like that's what they were arguing to the jury, and that was the evidence they put on. But the bottom line is they had to prove a design defect. That was their single claim. That was their burden, to prove that a feature of this fertilizer is what approximately caused the injury. They did not do that. They pointed to evidence that at most, at best, might have been evidence of a manufacturing defect, but they didn't have an expert on the manufacturing process. The question I was going to ask was essentially the same one, which is what is the consequence of this? I mean, you're basically arguing, well, they put on a manufacturing defect claim, but they hadn't actually pled that. So then what would that have meant? They should have just pled it, and we would have had a very similar trial. It would have been completely different. Judge Brescia, it's a complete failure of proof on the actual claim that was here. They came to court. They didn't carry their burden. They didn't bring an expert. They didn't establish that. And they've pointed to Dr. Sturckow. I want to address that because that's something they're pointing to now. He was the isotope tracing expert. He was not the design expert. He simply told the jury where the fertilizer came from. He did not testify about how it was designed or whether there was any flaw in the design. He didn't tell the jury it was designed to have 0.1, but it should have had 0.01. He didn't say that. What he said was if the fertilizer had 75% less in it, then the groundwater wouldn't have had to be treated. 75% less of what? That's the thing. He never said the what. Once again, is it that the design was, as far as I can tell, undisputed 0.1%, but sometimes it was coming out at 0.4%? In which case, if it had conformed to the design and been 75% less to conform to the 0.1, then we wouldn't have had this problem. That shows the design was actually not defective. And also, to your point about the expert testimony being required, let's say they're 75% less. Maybe the farmers would have had to use just that much more, so that would have factored into the risk-benefit analysis. It's very complex, and it would have been yes. Yes, Your Honor, there would have been questions about that, and there would have been balancing. We would have had a battle of the experts. That's what never happened here because they didn't carry their initial burden. Well, and so just to beat this horse one more time, the complaint says design defect. The whole effort at proof of trial on behalf of POMOA is with respect to the manufacturing defect. So if a trial proceeds on the theory of something that's not in the complaint, you can have, in essence, an amendment of the complaint. So that's not necessarily fatal to Pomona's case if they didn't proceed on the theory that had been put in the complaint way back when, you know, back when. Well, Judge Erickson, they never sought to amend their complaint. They never asserted that claim. All I'm saying here is they just failed to prove a design defect, and they threw out a lot of things that were very confusing to the jury, and there was a mishmash of lay testimony and really nothing else. But we know that you can't just point to the product and say the product itself is defective. You have to show some design feature of it is defective. That's Campbell. That's Sewell. That's all of these cases. And this court said, and I do want to point to the prior decisions from this court, just recited the Shallowby case also, where the court said that without an expert, the plaintiff did not establish a prime aphasia case. It's just it's been so uncontroverted under California law that that's part of their burden, that this court has said it now a couple times and repeating and citing all of these cases. Can I ask you to switch and then address the damages award? Yes, Your Honor. Thank you. So the damages award, there's no basis whatsoever for an award that is more than 50% higher than what Pomona's own expert asked for. And there's no evidence in the record that it's any more than $30.3 million. So there were two treatment facilities, AEP-1 and AEP-2, and then Pomona built the third, AEP-3. It's undisputed that's the facility they're using. No one's going to go back and use one and two. So we're now using that facility. The testimony was clear. And so at most, soaking wet, it would be $30.3 million. So I don't know where this number came from. There's no basis for it. It's really conjecture. Hold on. It wasn't their testimony. Let's assume that I believe your expert indicated that really you don't need to use AEP-3. Let's assume that the jury believed that, right, that they thought, okay, well, we'll give that expert credit for that. But what if they believe that the total operating cost for AEP-1 and 2 is $30,800,000? And then let's just say that in order to purchase the additional water, which there was testimony that was also presented to the jury, it was an additional $13 million. Then there was the interim per chlorate removal, which was 2.5. There's a way to get to the number that the jury ultimately established. It would be crediting some of the expert testimony that was presented, considering some of the testimony that was by perhaps both sides. I mean, and there are several scenarios that they can get to that number, can't they? I don't think so, Your Honor. It's just undisputed. They never said they're going to use anything but number three. I do want to address the foreseeability issue because I think that's so critical here. What we're talking about is Pomona as a bystander. They weren't a user. They weren't a consumer of this fertilizer. It was used in the city during World War II. And at that time, Pomona is a bystander. And at best, they can recover only if the harm was foreseeable. And the law in California is clear that for a bystander to bring a claim under a strict liability theory, the harm has to be foreseeable. And it was absolutely not foreseeable. And this Court already said last time around that it was undisputed that the harmful effects of perchlorate were unknown in the 1930s and 40s. And, in fact, this fertilizer at the time, it was critical at the time with World War II. Farmers needed it. Nobody could have looked ahead into the future and foreseen that in 2007, California would issue groundwater guidelines that made Pomona have to clean it up. That is in really no case holds otherwise. They haven't pointed to a single case that says that you don't have to show that it was foreseeable. And that's for good reason. I can't even imagine a world where every manufacturer would become an absolute insurer of all of its products because every city would potentially be a user if someone used the product. That's what their theory is. So what about the last decision from Artist Court, Pomona 3, I thought, that seems to have reset on this issue. No, Your Honor, actually that was only about user liability. So that was bystander question was not before this Court. No one was arguing about that because I think there was a dissent anyway on the user foreseeability requirement, and it was controversial. But that doesn't matter because now we're here where Pomona is proceeding as a bystander, and it does have to prove foreseeability. And the District Court only got around that by saying the city was effectively a user because people in the city used the product. So that just can't be right. That's not the law. And finally, I see my time is up. Is that the law of the case that we have to abide by? No, it is not, Your Honor, because that was, again, only for considering whether a user of a product. So the Court said that only a user in California, foreseeability isn't required in that situation, and that's at page 490 of the Court's decision. So, again, different issue. Now we're on a clean slate on this issue. This is about bystanders. Lastly, I see my time is running out, but I also want to say that Pomona's argument all along that the harm was foreseeable, if it says that, well, then that runs right up into the statute of limitations, of course, because, and it's argued to escape the statute of limitations, that the harm wasn't foreseeable. But here it's clear that based on this Court's ruling in 2014 that Pomona's claims are time-barred if it took steps to remediate, clean up, abate, or investigate perchlorate before October 2007. The evidence at trial was undisputed that they hired an engineering firm to start cleaning up the perchlorate in 2006, February 2006, that's before the date, so it is time-barred. So it's just, there's no dispute. They didn't put in any testimony to contradict that letter. The District Court's whole theory was that, well, Pomona didn't have a legal obligation until 2007 when California articulated the new standards to clean up the groundwater. But, of course, this Court knew that back in 2014, and it said that's not what matters. It's not whether Pomona had a legal obligation to clean up, but what did it actually do? Did it actually start investigating cleaning? And that letter is just crystal clear, and it's at Excerpts of Record 1568. And I would like to reserve the balance of my time. Thank you, Ms. Evangelos. Mr. Sansone, we'll hear from you. Good morning, Your Honor. May it please the Court. Ken Sansone on behalf of the City of Pomona. So there's been a lot that's happened in this case over the past 11 1⁄2 years, and, of course, we're here now based on what happened at the last trial. And what happened there was a jury which was instructed on the elements of a strict liability design defect claim under California law as agreed to by SQM in relevant part. SQM didn't object to that instruction on the grounds that we're hearing now, well, this is actually a manufacturing defect case. The jury specifically found that the city had proven the design of the fertilizer caused injury to the city. Let's get to that point. The council has just indicated that you need an expert to prove there's a design defect and that there is no testimony that establishes that there's an expert. She cited some cases, recently cited Case Braverman, I believe, since the last two or three days, and also Howard, among others. What authority do you believe establishes that you do or you don't require an expert for design deficiencies? So I would start with the Barker line of cases from the California Supreme Court, of course. Barker, the seminal products liability case under California law, followed by Campbell and Sewell. And all of those cases make clear that the plaintiff's burden of proof for a design defect claim under the risk-benefit test is simply to prove that a design feature of the product, and I believe counsel articulated this test the same way a couple of times in her argument, was the cause of injury to the plaintiff, and that when a plaintiff does that, without more, the burden shifts to the defendant to prove that the product was not defective, and that's where the evidence that you referred to, Judge Erickson, comes into play. So do you think you needed, did you have expert testimony on causation? Do you believe you were required to have that? I don't know whether we were or we weren't. I would argue that California case law doesn't uniformly establish an expert requirement for causation in a product liability case. Yes, and I think Campbell is an example of that. There was no causation expert in Campbell. But here, of course, we had multiple experts who offered testimony that the injury to the city was caused by the design feature of the fertilizer. In other words, the perchlorate in the fertilizer was the perchlorate in the water, and that was the city's injury. And multiple experts, Dr. Sturzio, who you've heard about, Professor Wheatcraft, a hydrogeologist, Professor Malillo, a historian, all testified to that. So we had multiple lines, multiple experts from multiple disciplines talking about causation. With all that, why not have a design defect expert? Well, I think it's important to consider the evidence that we did have. So these weren't snippets of deposition testimony from random witnesses here. This was deposition testimony from multiple executives of the defendant, a couple of whom had been designated under Rule 30b-6 as the most knowledgeable on the subjects of the perchlorate levels in the fertilizer, saying that the levels of perchlorate in the fertilizer were between 0.2 and 0.4 percent, and also saying, and this is extraordinarily important because I think there's some confusion here, SQM had the capability to produce the fertilizer with a perchlorate level not exceeding 0.1 percent. There is no evidence in the record at all that SQM's design of this fertilizer during this period of time was 0.1 percent. And again, in fact, these witnesses, Mr. Ponce, as you go through the witnesses, it sounds like you're about to do who testified to what the actual perchlorate percentage was. How does that relate to what the design, what it was designed to do? There was the 30b-6, well, maybe it wasn't 30b-6, but the in-house person who testified. We tried to do 0.01, it can be 0.02, maybe even up to 0.05. That relates to what actually happens as opposed to the design. The opponent right now is saying the design is reflected in the patent, and the patent is a patent for a 0.01 product. So isn't that the design, and what you presented at trial is evidence about the actual product, which would be the manufacturing. Well, this is the problem, Your Honor. The patent itself was not introduced into evidence. There's a very nice-looking graphic that shows excerpts from some historical patents, and the inventor, Mr. Kaplan Smith, that was introduced into evidence, and this one witness from SQM who actually testified live at trial testified to his opinion that the level of perchlorate in the fertilizer was 0.1 percent, but he actually testified at his deposition that it was 0.3 percent. That was read to the jury, and, again, multiple other SQM executives testified that the actual levels were between 0.2 and 0.4 percent. But that's my question. How does the testimony about actual levels support design theory? Because, Your Honor, several of those witnesses also testified that those levels, 0.2, 0.3, 0.4, were in accordance with a specification or a maximum perchlorate level of 0.5 percent. So, in other words, that's what SQM was trying to do. Mr. Ponce, who, by the way, was designated by SQM as an expert on the manufacture of this product. So, to the extent there is some requirement for us to present testimony from an expert about the design of the product, and I don't agree that there is, and I do want to get back to addressing Judge Mendoza's point on that, we did present testimony of that nature. Mr. Ponce, in the Guggenheim process, we're talking about 0.5 percent potassium perchlorate max. Mr. Lauderback was asked specifically about the product specifications, and he said nitrate specifications were for less than 0.5 percent perchlorate of sodium nitrate. The sodium nitrate is the product that we're talking about here. And then, of course, Mr. Dasominiak testified about the typical or average percentages of perchlorate in the product. And this isn't just my understanding or my interpretation of this testimony. SQM actually submitted before trial a motion in limine or a response to our motion in limine about some of this testimony, and they said in there that it was designed to contain perchlorate subject to an outside limit of 0.5 percent, and the design parameter for perchlorate was 0.5 percent, and that's in the supplemental excerpts of record at 3738. So let me, before I talk about the case law, address this idea of a bait and switch, which not surprisingly, I take great exception to this motion that I'm talking about, was filed because in spite of all of this testimony as to the specifications and maximum levels and what the levels actually were, SQM at trial tried to take the position, and they argued this, that the actual level was 0.1 percent. And so they tried to say, well, the actual level was 0.1 percent. The plaintiff is saying that 0.1 percent is fine, so that means the product's not defective. That was a complete reversal of what all of these witnesses had previously said, some in depositions that had been taken a couple months before trial. And that, I think, is the whole basis for this idea that, well, this was a manufacturing defect claim because they were trying to say, hey, it's actually 0.1 percent. But again, there's no evidence of that. That's not what any witness testified to, and that patent is not in the record. SQM at prior trials where they won had actually presented testimony from Mr. Ponce, attempting to explain why lowering the perchlorate level below the levels that he testified were in effect at the time, again, 0.5 percent maximum, had disadvantages. What was the practical effect of the ruling in Pomona 3 on how this case was tried? Because reading some of the closing arguments, there still were arguments about foreseeability that were seemingly made, and no one seems to be arguing that those were inconsistent with the ruling in Pomona 3. But can you give us a sense of how Pomona 3 affected the retrial? Well, Your Honor, we were arguing quite vociferously to the district court that the jury should not be instructed on foreseeability and the jury should not hear any evidence about a lack of foreseeability. And we knew going into closing arguments that despite our objections, and our objections were based on this court's decision in Pomona 3, that the jury was going to be instructed on foreseeability. And so we explained that there was evidence in the record that showed that there was knowledge that perchlorate was toxic going all the way back, and that this fertilizer was designed to be water-soluble, so that anything that was in the fertilizer was going to get into the water. Did the ruling in Pomona 3 end up having an effect on which experts could testify as to why did it end up having a tangible effect on the retrial? But not from our perspective, Your Honor. But again, I think it's important because we've heard about how SQM 1 prior trials, they put on different evidence. They put on evidence saying, well, if you lower the perchlorate level, it's going to be more expensive to produce this. If you lower the perchlorate level, you're going to remove the potassium, and potassium is a plant nutrient that has benefits that fertilizer is going to be difficult to handle. None of that testimony was put before the jury, and this is a good point to transition to the case law potentially. So Howard does indeed say several times that expert testimony is needed on a design defect claim, but it never says that the expert testimony is needed from the plaintiff in the first instance. It says it's admissible. It says it's properly considered, et cetera, and what happened in Howard was that quite unlike SQM in this case, the defendant actually put on evidence on summary judgment that showed that the design of the bathtub was appropriate, and so that shifted the burden back to the plaintiff on summary judgment to try to dispute that evidence in some way. Can you explain? It's just that the damage is an issue. Just have you explain how that $48 million can be justified based on the amount. Sure. Well, I think that Judge Mendoza gave an example of that, which frankly, you know, we didn't specifically address in our brief, but there are a number of ways that we do address in our brief that the jury could have come out around the 48, the very specific $48.128 million number that it awarded, and I think it's important to get a couple things out of the way first. Mr. von Buchert did not say that the maximum damages to the city were going to be around $30 million. We did not say at any point in our opening or closing statements that we were only asking for $30 million. What we said, that is the top-level number that was asked for. There wasn't some other number north of that. There wasn't any number that was asked for, Your Honor, what we said to the jury in closing statement, and this is consistent with California law, and California law is clear, and I don't think there's any dispute about that, that the injured plaintiff is free to choose among reasonable responses to the injury that the defendant has tortiously inflicted upon us, and as we said in our closing, the jury heard evidence from both of the water systems engineering experts who testified about a couple of different ways that the city could treat the perchlorium, and I certainly don't dispute that if the city were to pick and stick by one of those ways, which is using AEP-3 to treat the perchlorate, Mr. von Buchert testified that the cost of that combined with some other costs the city incurred before that plant went online were around that $30 million number, but the jury also heard evidence from both Mr. von Buchert and from Dr. Trussell about using the existing treatment plant, the pre-existing treatment plant. But you can't get both, right? I mean, you get one. Well, what Dr. Trussell actually testified is that, you know, he credited Pomona for having built AEP-3. He said they built that, that's money they have to spend, but they should shut it off, and so it would be appropriate on that record for the jury to award Pomona the costs of building AEP-3, but then the future costs, because, again, you know, we're talking about a future cost here. Actually, this is not a rationale the district court gave in denying the motion on this issue. I'm sorry, I believe that it is. You know, the district court said that Mr. von Buchert testified that using the pre-existing treatment plant to treat the perchlorate rather than AEP-3 would actually result in total damages of $87 million, which, of course, is about double what the jury actually awarded, and Mr. von Buchert explained how he got there. Part of that is water purchases, but a big part of that is simply the costs. As he was asked specifically for the total cost of treating perchlorate using those nitrate treatment plants, and he said, I used Dr. Trussell's number for my annual costs, a little lower than my number. That number was $1.33 million a year, so you can take that number, multiply it by a 30-year operational period, which is, of course, supported by the evidence, and then add it to the cost, $8.5 million or so of building AEP-3, you come in right around the neighborhood of $48 million. And, of course, it's somewhat implausible that the defendant would be putting forward a higher damages number than the plaintiff. We just have Dr. Trussell's testimony, and again, I think it's clear. And this isn't just me saying what Dr. Trussell said. I mean, this is the way the jury understood it. This is the way Mr. von Bucher, a very well-respected water systems engineering expert in his own right, understood it. And this is also the way, of course, the district court, which was hearing this evidence for the third time now, understood it. That there was an annual cost number of using the existing treatment plant to treat perchlorate that was somewhere between $1.33 million, but that was the number that Mr. von Bucher used, and $1.1 million, which is the delta between the $1.88 million annual cost number that Dr. Trussell gave, which includes $750,000 a year annually for the retirement of the debt on AEP-3. Again, Dr. Trussell believed that building AEP-3 but then discontinuing its use was something that would be reasonable for the city to do. And when one takes that number, it's $1.1 million. And again, multiplies it out by about 34 years or so. And as I understand, the testimony was that it cost more money to run AEP-3 than it did to run AEP-1 and 2, correct? Dr. Trussell's testimony was inconsistent on that point, I would argue. And I would also point out, as I think I have already, that the city is not required as the injured plaintiff to choose the cheapest way. Mr. von Bucher testified to some advantages of not using AEP-3. That's a whole other treatment plant. There's actually a picture of it in the record. It consists of about eight different enormous tanks. And of course, that's something that wears out and breaks over time, and you'll have to replace it, and that won't happen if you're not using it. And also, that plant uses a different kind of resin, which cannot be recycled, unlike the resin in the AEP-1 and 2 plants, and it needs to be disposed of. And so, again, it's up to the plaintiff to choose. The jury heard all of his testimony. It returned this verdict. The district court heard all of his testimony. It upheld the verdict. Was there any discussion in the jury instruction conference about trying to get a special verdict form that would have given us a little guidance in this area? Well, there was no jury instruction conference. Everything was submitted in writing, Your Honor. Did anybody submit in writing a proposed verdict form that had some breakdown on the damages? No, SQM did not ask for that, and neither did we. So, if I may, I just want to address a couple more points. One is our waiver argument, which I think is incredibly important. SQM's Rule 50A motion raised this manufacturing defect theory that we're hearing about now, made no reference whatsoever to causation, made one mention of a lack of expert testimony about design. Rule 50, by its terms, requires the party to specify the facts in the law. And I'm not going to say that requires citation of case law, but certainly the assertion of this legal principle that we're hearing now, that expert testimony is required. That was not asserted. We were not informed of the materiality of the dispositive fact, and limitations and foreseeability did not appear in that. Certainly, also, those arguments have been waived. They were raised in the new trial motion, of course, but this Court has said that reviewing a new trial motion based on the argument that the verdict is against the great weight of the evidence, and that was exactly what SQM was arguing in its new trial motion. As to these points, that the district court's decision to deny that is virtually unassailable, and it can be overturned only if there is an absolute absence of evidence to support it. SQM's briefing here does not even acknowledge that standard, let alone attempt to satisfy it. And, of course, all of this is incredibly important because the Seventh Amendment is at play here, and the Seventh Amendment does not allow reexamination of facts that have been found by a jury, and that's what would be happening here. I agree that foreseeability was fully addressed in the last decision. It's law of the case, and it can't be a way around law of the case to try to raise some new argument that the party didn't think of last time. In any event, both Barker and Elmore, the other case that SQM cites are crystal clear that that same strict liability rule, in hindsight, which, again, is what this Court relied on to say foreseeability was not required, applies to claims brought by users, consumers, or bystanders. In any event, there was evidence that it was foreseeable, and I've talked about that. If you could save your time, let me see if there are questions from my colleagues. Mr. Sands, I want to thank you for your argument this morning, and we'll hear a brief rebuttal from your opposing counsel. Thank you, Your Honor. Thank you, Your Honor. I'd like to quickly go back to the fact that Pomona failed to establish a design defect that caused the injury. There was no evidence of what the specific design actually was. The patent is in the record. Naranjo testified. Its pages 937 to 38 testify that 0.01% was in accordance with the patent, 0.1%. And as far as the supplemental excerpts of record that my opponent cited about the amount being set at 0.5%, that's actually inaccurate. That is about the early 1900s before the Guggenheim Method. So, totally not an issue in this case. That predates the time period and issue here. And here, there was no causation expert. Sterchio wasn't qualified to testify. He should never have been admitted on that issue. It was just a throwaway sentence at the end of his testimony. There was no testimony here that all perchlorate was defective. It was all about how much is too much. But we never knew how much they actually were saying was in the fertilizer because it was a moving target, and they were throwing all of these different things out there. And it was just lay testimony. There was no expert to carry their burden. And the cases are, Stephen, that shows that the causation issue really is the defect issue. It's all the same thing, and they need an expert. They expressly disavowed a manufacturing defect theory before a trial. Mr. Erickson, that has never been in this case. It's just about design defect, and they failed to carry their burden of proof. And also, I just want to address briefly about damages. Jeff Bresley can't have it both ways. They put all their eggs in the AEP-3 basket. That was what they argued for, and their expert, Von Buescher, said the high amount was, a high-end quote of what it would actually cost was $30.3 million. Our expert certainly didn't testify. And so regardless of whatever they argue, the jury can listen to both and disregard that part of it, all of it, or none of it. I mean, I remember telling the jury all the time just exactly those words. So maybe they took part of one and maybe took part of the other. Your Honor, it's really a made-up number. I don't know how we get to it. I have no idea because our expert testified the most the damages should be is $12 million. So to take their expert's high number and our high number and add them together and then round up another $6 million somehow, that just, there's no basis for that. There's just no basis whatsoever for that. That's why we would ask that the court at a minimum remit the judgment to $30.3 million. But here, the court should reverse. This design defect flaw is fatal. It's been said time and time again that that's what a plaintiff needs to proceed on a design defect theory, and they never pointed to the exact feature of this fertilizer. It was never argued that all perchlorate was bad and that it all should have been removed. It was all about what levels. They never pinpointed that. So here, they failed to prove their case, and also it was not foreseeable, and the claims are time-barred. So we would ask for the court to reverse, but at a minimum enter a new trial because it just, I can address the waiver issue. I think these arguments are preserved. I think we have your argument. So I want to thank you, Ms. Evangelist, for your argument this morning. Mr. Sanson, thank you for your argument. I appreciate it, and we appreciate very much the fine briefing and argument on both sides of this case. This matter is submitted and will stand in recess until tomorrow morning. Thank you. All rise. This court for this session stands adjourned.
judges: BRESS, MENDOZA, Ericksen